SAM SPINO, APPELLANT, v. RALPH STOUGHTON AND FRANK BARBARO, DOING BUSINESS UNDER THE NAME AND STYLE OF NEVADA BILTMORE HOTEL, RALPH STOUGHTON AND FRANK BARBARO, AS INDIVIDUALS, ET AL., RESPONDENTS.

No. 3552

July 6, 1949. 207 P.2d 1101.

*Jones, Wiener & Jones,* of Las Vegas, and *Nicholas Catri,* of Sandusky, Ohio, for Appellant.

*George E. Marshall,* of Las Vegas, for Respondents.

## OPINION

By the Court, BADT, J.:

This is an appeal from a judgment in favor of defendants and from an order denying plaintiff's motion for a new trial. To avoid confusion the parties are referred to by their names rather than identified as parties plaintiff, defendant, appellant or respondent.

Sam Spino sued Ralph Stoughton and Frank Barbaro individually and as partners doing business under the name and style of Nevada Biltmore Hotel, alleging that, being indebted to the plaintiff on June 18, 1947 in the sum of $16,500 and in consideration of such indebtedness, they promised to pay him that sum on demand but have failed to do so. At the time of the filing of the complaint a writ of attachment was issued on the basis of an affidavit executed by one of Spino's attorneys reciting that the defendants were indebted to plaintiff for $16,500 "upon an implied contract for the direct payment of money, to wit: For advance rental remaining unused." Plaintiff's undertaking for attachment likewise recited that the action was upon a contract for the direct payment of money, namely, $16,500. Stoughton answered and denied these allegations. Barbaro

did not appear and the record does not show that he was served. At the conclusion of the trial the court rendered an oral opinion and decision from the bench and later signed its findings comprising one single finding of fact that Stoughton was not on June 18, 1947 indebted to Spino for $16,500, or at all. The only objection made to the finding was that the court should have found that Stoughton was indebted. On the court's findings, judgment was rendered in favor of defendant Stoughton for costs and that plaintiff take nothing. No judgment was rendered with reference to Barbaro and he is not involved in the appeal. Spino moved for a new trial on the ground of insufficiency of the evidence and errors in law occurring at the trial, which motion was denied. Appellant recognizes the rule that this court will not disturb the findings or judgment based upon a substantial conflict in the evidence, but insists that the uncontradicted evidence shows the indebtedness of Stoughton to Spino and Stoughton's promise to pay. He insists that the contrary finding (we assume that the finding of no indebtedness included the implied finding that there was no promise to pay) results from the court's misconstruction of a certain instrument admitted in evidence as plaintiff's Exhibit "B"; that such misconstruction was an error in law which this court is at liberty to correct. A review of the facts is necessary.

The situation could happen only in Nevada where open gambling is licensed and where the license fees for conducting the games of roulette, craps, twenty-one, faro bank, poker, race horse keno and other games,[1] and the tax of 2 percent on the gross winnings[2] form a

[1] An establishment operating three games pays a license fee of $750 a year; for four or five games, $1,750; for six or seven games, $3,000; for eight to ten games, $6,000; for eleven to thirteen games, $10,000; for fourteen to twenty games, $20,000; and for twenty-one or more games, $30,000. Nev.Stats.1947, p. 734. Slot machines pay a license fee of $10 a month each. N.C.L. sec. 3302.01.

[2] Nev.Stats.1947, p. 734.

material part of the revenues with which the state conducts its business. Gambling casinos, operated independently as such and in connection with most of the large hotels and nightclubs in the state, or the leasehold interests in such casinos (generally including ownership of the gambling paraphernalia as well as the stock of liquors, etc., in the ever attendant bars) are sold for enormous sums with little or no formality. A memo "on the cuff" is all that evidences many such a transaction. The gambler's[3] word is as good as his bond and if litigation sometimes results from the transactions, as in the instant case, it is generally caused by a difference of opinion as to the precise circumstances or legal effect of some particular transaction. Such has occurred in the present case.

Prior to March 22, 1947 Stoughton had a lease from Nevada-Biltmore Hotel Corporation on the Nevada Biltmore Hotel at Las Vegas. This included the hotel proper and the gambling casino conducted in connection therewith. On that date, however, he entered into a partnership with Barbaro (the partnership had existed since February 15 under an oral agreement). By the written articles of partnership of March 22, Stoughton's lease was assigned to the partnership and they operated as partners until May 27, 1947. (The lease contained no covenant against assignment or subletting.) The operation did not prove profitable and the partnership was in straitened financial circumstances. The record indicates that this was at least in part due to expensive

---

[3] In Nevada a "gambler" is not a man who gambles, despite the dictionary definitions to such effect. A gambler is one who conducts the various gambling games mentioned above. The percentage in favor of the gambler is such that, given a sufficient volume of play, such percentage, under the laws of chance and of averages, is bound to result in profit to the gambler if not offset by the expense of the operation or other unexpected and unusual circumstances. Roulette odds average "a take" by "the house" of $5.42 of every $100.00. Percentage against the player at craps is about 1.5 percent; at "twenty-one," 2 percent, etc.

entertainment provided as attractions to the patrons, which ran as high as $10,000 a week or more. For a period of time $9,000 a week was paid for one act. About May 20, 1947 Barbaro left and his whereabouts for some days was unknown. He was located, however, on May 27, at which time the partnership was dissolved by a written memorandum, Stoughton was paid a consideration by Barbaro, to be discussed later, and assigned the entire lease and business, etc., to Barbaro. At about this time, or more precisely on May 22, Spino came into the picture. On that date the operation of the casino was turned over to him. He was first introduced to Stoughton about May 15. The oral arrangement made with Spino was that he was to take over the casino for a consideration of $500 a day rental in addition to 50 percent of the net winnings. However, Stoughton was at the time embarrassed by lack of cash, as he had planned on a sale for a cash consideration rather than a lease, and Spino lent him $10,000 in cash, advised that he wanted no security, and accepted Stoughton's I.O.U. for $10,000. Spino, in addition, paid $500 a day in cash on May 22, 23, 24, 25, and 26, respectively, as rental of the casino for those days. On May 26 or 27 Spino informed Stoughton that he knew where Barbaro was. They got in touch with him at his motel in Las Vegas on May 27 and following a conference Stoughton executed a new memorandum with Barbaro, mentioned above, assigning the lease to him. There is a material conflict in the testimony as to just how the consideration passed and what it amounted to, but the trial court's oral opinion, amply justified by the testimony, indicates that at this meeting Spino handed Barbaro $10,000 in cash and also the $10,000 I.O.U. that Stoughton had theretofore executed and delivered to Spino. This aggregate of $20,000 Barbaro in turn delivered to Stoughton. Stoughton thereupon tore up the I.O.U. and pocketed the $10,000. It was simply a

$20,000 cash transaction for the assignment by Stoughton to Barbaro of the former's interest in the business, etc. At this point Stoughton owed Spino nothing, and the understanding was that Spino's aggregate advance of $20,000 comprised a prepayment of forty days' rental of the casino at $500 a day. The meeting of May 27 was attended by Spino, Mr. and Mrs. Barbaro, Stoughton and two other persons.

On June 4 Spino lent Barbaro $4,000 cash and on June 6 he lent him an additional $4,000 in cash.

On June 18 Stoughton at Las Vegas called up Spino in Sandusky, Ohio, and urged him to come out at once, as Barbaro had advised that he was "in a very bad fix" at the Nevada Biltmore Hotel, that Barbaro was going to leave, that Stoughton didn't know for sure what he was going to do but that he was going to try to hold the place together until he got some of the bills paid off, but that he needed financial help. Licenses, taxes and rentals were all payable, and the lease was in danger of being lost, together with a forfeiture deposit of $20,400 made to the Nevada-Biltmore Hotel Corporation. Spino offered to pay $100 a day if that would help. Stoughton said anything would help. Stoughton said that his deal with Barbaro was off and a new arrangement would have to be made. Appellant claims that the effect of the conversation was that the arrangement for Spino's $500 per day rent payments was off and that in place of this he was to pay $100 a day. The district court found otherwise, and that the $100 a day was to be an additional sum. As to such $100 per day the learned district judge said: "It could amount to a loan. It could amount to a donation. It could amount to advance rents. It seems to the court immaterial what it is, but it was paid. It was paid for twenty-two days, June 19 to July 10, inclusive. There is $2,200 he paid, and he really didn't have to pay it. He just did it because he wanted to keep the place going, and probably to try to salvage what he had in the place and to use

up the balance of his rents." This conclusion finds ample support in the testimony of Stoughton and also of Berry who was co-manager of the casino from May 22 to June 18.

On June 19 Stoughton and Barbaro entered into a new agreement which recited the operation of the premises under the lease from Nevada-Biltmore Hotel Corporation for the period February 15–May 27, 1947, the dissolution of the partnership on the later date and the further indebtedness that had accrued from May 27 to June 17 in the aggregate of approximately $53,000, and Barbaro agreed that Stoughton was to have sole and exclusive management (Barbaro executing a complete bill of sale) and the right to sell the business, including the leasehold interest, and that "upon such sale if one shall be made [Stoughton] shall apply all of the proceeds of such sale upon the debts of the parties hereto"; that a deficiency should be borne equally by the parties; that the auditor should prepare "a correct statement of account, and all debts owed by either of the parties since February 15, 1947, to and including June 17, 1947, and this audit shall be the basis upon which the parties hereto obligated themselves"; and that if Stoughton elected to operate the premises, as a result of which he could pay all of the debts accumulated, he was to be sole owner, and Barbaro waived any further claim. The record discloses neither a sale by Stoughton, nor such operation by him as to enable him to pay the debts. Outside of Barbaro's departure on June 19 and Spino's departure after July 10, we are not advised as to the fate of the casino or the Nevada-Biltmore lease.

Appellant contends that Stoughton was in any event liable as a partner for all of the debts accruing during the entire period discussed; that these debts included the indebtedness to Spino and that by the foregoing instrument Stoughton definitely assumed and promised to pay Spino; and that the district court's conclusion that Stoughton did not thereby assume the payment of

accounts that had accrued subsequent to the dissolution of the partnership on May 27 was such a palpable misconstruction of the contract as to constitute an error at law which must result in a reversal.

We are unable to agree with this reasoning. Spino was not a party to and did not sue on the contract of June 19 between Stoughton and Barbaro as a contract entered into between the latter two for Spino's benefit. The contract was simply one item of evidence introduced to support Spino's claim that Stoughton, being indebted to him for $16,500, had agreed to pay him that sum. The affidavit for attachment, as we have noted, claimed that the indebtedness grew out of an implied contract to pay. Stoughton denied the alleged indebtedness from him to Spino but admitted on "obligation" to him, which obligation was apparently his obligation to see that Spino was permitted to remain in possession and control of the casino for the entire term of his prepaid rental. Such undisturbed possession from May 22, 1947 to and including July 10, 1947, was frankly admitted by Spino.

■ Appellant's brief simplifies the matter still further. He contends: "It is for these sums, the unexpended balance of the $20,000, amounting to $8,500 and the loans to Barbaro amounting to $8,000 for which plaintiff seeks judgment." Even if we assume that the complaint stated a partial failure of consideration for the $20,000 payment, that only part of its consideration had been paid and that Spino was entitled to return of the balance, nevertheless the $20,000, paid as advance rental at the rate of $500 per day, was, as a matter of fact, entirely consumed. Spino actually operated the casino from May 22 through July 10. Appellant's answer to this is that by the telephone conversation of May 27 it was agreed that the rentals should be reduced from $500 a day to $100 a day, that Stoughton's statement that the whole deal was off and Spino's agreement to advance $100 a day cash abrogated the whole agreement—in effect that there was a novation. But both Stoughton

and Berry testified that it was the deal between Stoughton and Barbaro that was called off and the district court was justified in so holding. Another factor likewise justifies this. The $500 per day arrangement included the payment by Spino of half of the net profits. Appellant does not even suggest what division or disposition of all or any part of the net profits was to go to the respective parties under Spino's agreement to pay $100 a day. To abrogate the $500 a day arrangement a new contract would necessarily have to provide for some disposition of the net profits. Accordingly Spino's prepayment of $20,000 for rental at $500 a day was completely compensated. He operated for forty-five days, which would amount in rentals to $22,500. The cause of action for $8,500 for unused rentals, even if we deem that it was properly pleaded, therefore entirely fails.

■ There remains only the matter of the two $4,000 payments of June 4 and June 6, respectively, which Spino made to Barbaro, and not the partnership, while Barbaro was operating for himself after the dissolution of partnership of May 27. Under Stoughton's testimony, and under the documentary evidence showing Barbaro's receipt of these loans, the district court had substantial evidence to support its finding that Stoughton was not indebted for the payment to Spino of this sum. No attempt was made to show any new consideration under a separate cause of action under the theory that Spino as a beneficiary could or did sue on the contract of June 19 between Stoughton and Barbaro.

We are still left with the fact that Spino paid an additional $100 a day for twenty-two days aggregating $2,200. Appellant's brief, however, shows that he claims no reimbursement or cause of action growing out of this item.

In the oral argument of this case counsel for the respective parties consumed but fifteen minutes each— something of a record for brevity in this court. They discussed the facts only and not a single authority was

cited. We find with some amazement that we have likewise cited no authorities in this opinion. All this fortifies us in our conclusion that the question is one of fact only. But three witnesses testified, Spino, Stoughton and Berry. The court accepted the testimony of Stoughton, corroborated on the main issue by Berry, and supported by the documentary evidence. We have no other course open other than to affirm the judgment and the order denying a new trial, with costs to respondent. It is so ordered.

HORSEY, C. J., and EATHER, J., concur.